Donald KNOY, Appellant–Defendant,

v.

Joseph W. CARY and Janice Cary, Appellees–Plaintiffs.

No. 42A01–0211–CV–445.

Court of Appeals of Indiana.

Aug. 29, 2003.

Eric D. Johnson, Kightlinger & Gray, LLP, Indianapolis, IN, Attorney for Appellant.

Todd C. Barsumian, Kahn, Dees, Donovan & Kahn, LLP, Evansville, IN, Attorney for Appellee.

**OPINION**

ROBB, Judge.

Joseph Cary was injured during an after hours community service project sponsored by his employer, Gemtron Corporation ("Gemtron"), due to the alleged negligence of co-worker Donald Knoy. Cary filed suit against Knoy and Knoy filed a Motion to Dismiss, contending that the trial court lacked subject matter jurisdiction. Following a hearing, the trial court denied Knoy's motion and Knoy now appeals. We affirm.

*Issue*

Knoy raises one issue for our review which we restate as whether the trial court

properly denied Knoy's Motion to Dismiss.[1]

### Facts and Procedural History

Gemtron sponsored a clean up activity at a local park in Vincennes, Indiana. A notice was posted on the company bulletin board announcing the activity and inviting employees to participate. Additionally, Gemtron sought publicity within the community by asking the local newspaper to cover the event. Gemtron supplied the participating employees with work gloves, food and beverages.

Knoy and Cary participated in the clean up activity. Knoy provided a tractor for use in the project. Gemtron provided a chain to be used in conjunction with the tractor to assist in cleaning up the site. Although the facts of the injury are in dispute, the facts suggest that Cary was injured while assisting Knoy in pulling some debris from a riverbank in the park using the tractor.

Cary filed a suit in the trial court, alleging that he suffered injuries as a result of Knoy's negligence. Knoy filed a Motion to Dismiss, arguing that the trial court lacked subject matter jurisdiction and that Cary's exclusive remedy lay in the Worker's Compensation Act. Following an evidentiary hearing, the trial court issued only two Findings of Fact:

1. That [Cary]'s injury did not arise out of and in the course of his employment with Gemtron Corporation.

2. That this Court has subject matter jurisdiction to hear this case.

Appellant's Appendix at 3. Relying on these Findings, the trial court denied Knoy's Motion to Dismiss. This appeal ensued.

### Discussion and Decision

#### I. Standard of Review

Jurisdiction is the legal power to entertain any matter or proceeding and the power to act must be derived from the Constitution or some statute. *Farley v. Farley*, 157 Ind.App. 385, 300 N.E.2d 375 (1973). If the facts before the trial court are in dispute on a motion to dismiss for lack of subject matter jurisdiction, appellate review focuses on whether the trial court conducted an evidentiary hearing, and where the trial court conducts an evidentiary hearing, its factual findings and judgment are given deference which will not be reversed unless clearly erroneous. *In re Paternity of Baby W.*, 774 N.E.2d 570, 575 (Ind.Ct.App.2002), *trans. denied.* In the present case, the trial court conducted an evidentiary hearing and issued findings of fact. Therefore, we will review the court's findings for clear error.

#### II. Knoy's Motion to Dismiss

Article I, Section 12 of the Indiana Constitution provides:

> All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

Ind. Const. art. I, § 12. The Indiana Worker's Compensation Act contains an

---

**1.** Cary filed a Motion to Strike, contending that two statements in Knoy's reply brief were additional argument not contained in Knoy's Appellant's Brief. *See* Ind. Appellate Rule 46(C) ("No new issues shall be raised in the reply brief.") However, we do not believe that the statements in Knoy's reply brief were

actually additional issues. Rather, Knoy is responding to statements made in Cary's Appellee's Brief that Knoy felt were either misstatements or which gave only one side of the story. Therefore, because the statements do not violate Appellate Rule 46(C), Cary's Motion to Strike is denied.

exclusivity provision which limits an employee whose injury meets the jurisdictional requirements of the Act to the rights and remedies provided therein. Ind.Code § 22–3–2–6; *Sims v. United States Fid. and Guar. Co.*, 782 N.E.2d 345, 349 (Ind. 2003).[2] Accordingly, if an employee's injury occurred by an accident arising out of and in the course of employment, then the employee is entitled to worker's compensation benefits. *Sims*, 782 N.E.2d at 349. The exclusivity provision bars a court from hearing any common law action brought by the employee for the same injuries. *Id.* at 349–50. Since the Industrial Board, the Worker's Compensation Act's administrative body, has exclusive jurisdiction, lawsuits filed by employees for injuries suffered that arise out of and in the course of employment are subject to dismissal by the trial court or lack of subject matter jurisdiction. *Ski World, Inc. v. Fife*, 489 N.E.2d 72, 73 (Ind.Ct.App.1986).

An injury "arises out of" employment when a causal nexus exists between the injury sustained and the duties or services performed by the injured employee. *Milledge v. Oaks*, 784 N.E.2d 926, 929 (Ind. 2003). An accident occurs "in the course of employment" when it takes place within the period of employment, at a place where the employee may reasonably be, and while the employee is fulfilling the duties of employment or while engaged in doing something incidental thereto. *Id.*

### A. After–Hour Injury Cases

Historically, injuries received during after hours activities that had some connection with employment were not considered to have arisen out of and in the course of

employment. *See, e.g., Tom Joyce 7 Up Co. v. Layman*, 112 Ind.App. 369, 44 N.E.2d 998, 1001 (1942) (reversing an award by the Worker's Compensation Board where an employee was injured while returning home after participating in an employer-sponsored bowling team). However, in *Noble v. Zimmerman*, 237 Ind. 556, 146 N.E.2d 828 (1957), our supreme court held that an injury following an after hours meeting held at the summer cottage of one of the partners arose out of and in the course of the injured party's employment. *Id.* at 835. In that case, an employee was injured diving into the lake following the meeting. Upon reviewing the award made by the Worker's Compensation Board, the court noted that:

> There is little doubt a reasonable inference from this stipulation of facts would be that the dinner following the meeting and any boat ride in [the] employers' Chris–Craft cruiser at employers' solicitation were reasonably incident to the business meeting and employment on the hot July night. Had deceased choked on a fish bone at the employers' furnished repast or drowned during the employers' offered boat ride, would it not be a reasonable inference that such activities following the meeting were sponsored by the employer as a matter of business and for developing better service and efficiency among the employees rather than being simply altruism? Doubtless the recreational inducements were utilized by the employers on a hot night in July to get better attendance at a business meeting which had as its admitted purpose the improvement of

---

**2.** Indiana Code section 22–3–2–6 states, in pertinent part:

> The rights and remedies granted to an employee ... on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, the

employee's personal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under IC 5–2–6.1.

service and sales of appellants'-employers' automobile business.

*Id.* at 833–34. After stating that eating, boating, and swimming were reasonably incident to the employment, the court turned to the question of whether diving into the water must also be incident to the employment. *Id.* at 834–35. Finally, the *Noble* court stated:

> We realize it is sometimes argued in recreational cases that if the court holds the recreational activity to be within the Compensation Act, it is exercising too great a degree of liberality in construing the act. However, in recent years it has become increasingly evident that employers are more and more utilizing recreational programs for their employees, and properly so, in aiding and promoting better business relations with persons in their employ, calculating the same to benefit the employers' best business interests.

*Id.* at 834. Therefore, the court held that the injury and death arose out of and in the course of the employment.

Almost thirty years later, this court relied on *Noble* in deciding *Ski World.* In *Ski World,* the plaintiff was injured during an after hours party sponsored by her employer. In holding that the plaintiff's injury arose out of and in the course of her employment, the court noted that Ski World owned and controlled the property upon which the party was held, that Ski World encouraged and therefore presumably expected its employees to attend the party and Ski World provided the refreshments, entertainment, and recreational equipment. *Ski World,* 489 N.E.2d at 77. Additionally, the court stated:

> Finally, and most significantly, Ski World believed that holding such an event would be in its best business interests. Uncontradicted testimony reveals that Ski World had two distinct purposes for holding the party: (1) to boost employee moral [sic] in anticipation of increasing enthusiasm in the workplace, thereby increasing efficiency and productivity; and (2) to allow employees in one area of the resort's operations to observe the entire operation, thus familiarizing each employee with other jobs being performed, in an attempt to increase the flexibility of its workforce. Here, just as in *Noble,* there is a clear nexus between work activities and after hours recreational activities—the one flowed directly from the other.

*Id.*

More recently, this court has applied *Noble* and *Ski World* in *Weldy v. Kline,* 616 N.E.2d 398 (Ind.Ct.App.1993). After discussing the holdings in those cases, this court stated:

> [I]t is clear that Kline's accidental death arose out of and in the course of his employment. The party attended by Kline was an after hours party thrown by his employer. Attendance was voluntary, but encouraged, and the food, activities, and location were provided by [the employer]. In addition, Kline's manager ... stated that the purpose of the party was to generate good will among the employees and to otherwise benefit [the employer].... [T]hese circumstances demonstrate a clear nexus between the work activities and the recreational activities that caused his death.

*Id.* at 405.[3]

## B. Knoy's Motion to Dismiss

Knoy concedes that this court and our supreme court have not previously ad-

---

**3.** However, the court was unable to resolve the issue of whether Kline's death arose out of

dressed whether injuries received during an after hours community service activity sponsored and organized by an employer arise out of and in the course of employment. However, he encourages us to extend the holdings of *Noble, Ski World,* and *Weldy* to reach that conclusion.

In support of his position, Knoy argues that Cary's injuries occurred during his period of employment at an event organized and sponsored by Gemtron. Additionally, Knoy notes that Gemtron sought volunteers from among its work force by posting a notice on the company bulletin board and by supplying work gloves, food and beverages to the participants. Finally and most importantly, Knoy states that undisputed testimony was presented at the hearing that the clean up activity was performed in accordance with Gemtron's business plan and was intended to promote Gemtron's business interests. Accordingly, Knoy argues that we should hold that Cary's injuries arose out of and in the course of his employment and reverse the trial court's denial of Knoy's Motion to Dismiss.

Cary, however, states that the clean up was a voluntary community service activity not designed to aid or to promote better business relations among Gemtron's employees or to further Gemtron's business interests. Gemtron, according to Cary, was merely promoting goodwill between the company and the community. Cary notes that this court has opined that the charitable act of promoting goodwill between a company and the public is "an amorphous and speculative benefit" that cannot "by itself supply the required nexus

between the accident and the employment so as to confer coverage under the [Worker's Compensation] Act." *Construction Mgmt. & Design, Inc. v. Vanderweele,* 660 N.E.2d 1046, 1051 (Ind.Ct.App.1996), *trans. denied* (reversing an award by the Worker's Compensation Board where a construction worker was injured while helping a stranded motorist off of the employer's premises).

The holdings in *Noble, Ski World,* and *Weldy* lead us to believe that there are two important factors in deciding whether an injury arises out of and in the course of employment: first, whether the employer's encouragement to attend the event crosses the line into an expectation of attendance and second, whether the activity is designed to benefit the company in some way other than merely providing an enjoyable activity for the employees. Both are difficult questions to answer because different participants may see things in different ways, but, should there be contradictory evidence, we must remember that we are reviewing the trial court's decision under an abuse of discretion standard. Therefore, unless the uncontroverted evidence suggests that the trial court abused its discretion, we will affirm.

As to the first question, we need to determine whether the encouragement to attend crossed the line from voluntary to expected. For an answer to this question, we look to the transcript from the hearing. At the hearing, Robert Glenn, Human Resource Manager at Gemtron, testified that he plans the clean up activities for Gemtron. Transcript at 9. Regarding the clean

---

and in the course of his employment because there was no factual determination made by the trial court on the question of whether Kline participated in the horseplay which caused his death. If, upon remand, the trial court determined that Kline participated, then jurisdiction would have been proper in the

trial court. If the trial court determined that Kline did not participate, the trial court was ordered to dismiss the action for lack of subject matter jurisdiction because the exclusive remedy laid in the Worker's Compensation Act. *Weldy,* 616 N.E.2d at 406.

up activity at which Cary was injured, Glenn stated:

Q: Cleaning up river banks was not a part of Mr. Cary's regular duties, was it?

A: No.

Q: I want to turn your attention to September 18, 1999, cleanup of Kimmel Park. Employees were not ordered to attend the event, were they?

A: No.

Q: And nothing in Gemtron's rules required that employees attend?

A: No.

Q: And nothing in Gemtron's job descriptions made attendance mandatory?

A: No.

Q: And Gemtron did not inform employees that they be required to attend when they interviewed with Gemtron?

A: No.

Q: Am I correct that no one was disciplined for not attending this cleanup?

A: No one was disciplined for not attending.

Q: Am I correct that Gemtron did not have a signup sheet to measure anticipated attendance?

A: No, I don't believe there was a signup.

Q: Am I also correct that Gemtron did not have a sign in sheet to measure actual attendance?

A: No.

Q: No, they didn't have a sign in . . .

A: Did not have a sign in sheet.

Q: Okay, so then I'm correct. Am I correct that there were Gemtron employees that did not attend the cleanup?

A: You are correct.

Q: Would I be correct that there were Gemtron supervisors that did not attend the cleanup?

A: That is also correct.

. . .

Q: If you were an employee who didn't participate in the cleanup, did Gemtron say, well, you've got to work instead?

A: No.

*Id.* at 16–18. Glenn's personnel assistant, Joann Lange, also testified that the cleanup activity was voluntary and that she chose not to take part without any repercussions. *Id.* at 35. Therefore, although some cleanup and after hours activities may cross the line from voluntary to expected attendance, it was clear from testimony at the hearing that the cleanup at which Cary was injured was voluntary.

The second question relates to whether Gemtron expected to derive any benefits out of the activity besides a cleaner park. In *Ski World,* the court noted that the after hours activity was designed to boost employee morale and to allow employees in one area of the business to observe the entire operation to better increase the flexibility of the workforce. 489 N.E.2d at 77. There was no testimony offered at the hearing that Gemtron's cleanup activity was designed to meet either of these specific goals.

Additionally, in *Weldy,* this court noted that the purpose of the party was to generate good will among the employees and to otherwise benefit the employer. Although good will among the employees may have been an outcome of the cleanup activity, there was no testimony presented that the cleanup was intended for that purpose.

Here, Glenn testified regarding Gemtron's purposes in organizing the cleanup

activity. Glenn testified that Gemtron produced a customer-oriented master plan which defined the corporate goals with regard to environmental activities. Transcript at 13. He stated:

Q: And can you describe for the Court generally what that customer-oriented master plan is?

A: It's a description of goals in various areas that the corporation and its managers try to achieve for that physical [sic] year.

Q: Can you tell the Court who produces that document?

A: It's generated at the Gemtron headquarters in Sweet Water, Tennessee.

Q: And you mentioned other areas that it covers besides environmental. Can you describe those areas?

A: Quality, profitability, scrap, employee relations. It's a general business plan.

Q: Who is this document given to?

A: All the business managers and their immediate subordinates.

Q: Would you please read the section, the vision statement for the Court.

A: Environment Gemtron will work in harmony with the environment and the community.

Q: And would you please read the section labeled milestone for the Court?

A: Gemtron Corporation is recognized as an environmental leader in the communities where it operates.

*Id.* at 13–14. Knoy contends that, because the cleanup satisfied part of Gemtron's business plan, Cary's injuries arose out of and in the course of his employment. We disagree.

Although Gemtron did have as part of its general mission statement a desire to clean up the environment in the areas where it operated, our supreme court in *Noble* found a distinction between business and altruistic motives in organizing cleanup activities. The court stated:

> A distinction is made, however, in those cases where the recreation which caused the injury, either directly or indirectly, was sponsored by the employer as a matter of business and not because of altruistic motives. That is, the employer exercised control or domination over the recreation for the purpose of developing better service and greater efficiency among the employees, thereby reaping a direct business benefit from the recreations sponsored.

*Noble*, 146 N.E.2d at 832 (citing Schneider's Workmen's Compensation Law, V.6, ch. 25, p. 519). Although Gemtron's interests may have been calculated to promote their goodwill in the community, this is not a direct business benefit as described by our supreme court in *Noble*. Additionally, this court has held that such an amorphous benefit is not sufficient to confer coverage under the Worker's Compensation Act. *See Construction Mgmt.*, 660 N.E.2d at 1051.

Therefore, because no evidence was presented at the hearing to show that Gemtron expected its employees to attend and the only benefit to Gemtron was to promote goodwill in the community, we hold that the trial court did not err in denying Knoy's Motion to Dismiss.

### Conclusion

The trial court did not abuse its discretion in denying Knoy's Motion to Dismiss. We affirm.

Affirmed.

VAIDIK, J., concurs.

FRIEDLANDER, J., dissents with opinion.

FRIEDLANDER, Judge, dissenting.

I respectfully disagree with the majority's conclusion that Knoy's motion to dismiss was properly denied, and therefore dissent.

The crux of the matter in this case is whether the clean-up event organized by Gemtron was such that the injury suffered by Cary while working there may be deemed to have occurred in the scope and course of his employment. The parties and the members of this court all agree that the resolution of this case turns upon our supreme court's decision in *Noble v. Zimmerman*, 237 Ind. 556, 146 N.E.2d 828 (1957), and our subsequent decisions in *Ski World, Inc. v. Fife*, 489 N.E.2d 72 (Ind.Ct. App.1986) and *Weldy v. Kline*, 616 N.E.2d 398 (Ind.Ct.App.1993). Those cases set forth the parameters of the meaning of "arises out of employment" and "in the course of employment" in this context. Both components, of course, are prerequisites to the ruling Knoy seeks, i.e., that the Worker's Compensation Act applies and the trial court is without jurisdiction to preside over this tort action. The majority concludes, after reviewing *Noble*, *Ski World*, and *Weldy*, that Cary's injuries neither arose out of his employment at Gemtron nor occurred in the course of his employment there. My reading of those cases leads me to the opposite conclusion.

In a nutshell, the majority concludes on the first component that Cary's injuries did not arise out of his employment because Gemtron employee attendance at the clean-up was "voluntary", as opposed to "expected." *Slip op.* at 577. I cannot find in *Noble*, *Ski World*, and *Weldy* a discussion that sheds light on the distinction between "voluntary" and "expected" in this context. Indeed, it appears to me that the line between the two is not a bright one and that the difference is one of degree. As I read them, all three of the cases involve injuries that, as here, occurred during an activity or event that could not in any sense have been described as compulsory.

In *Noble*, the ultimately fatal injury occurred while the decedent was diving into a lake following a business meeting. Although attendance at the business meeting was described as having been more or less mandatory, the recreational activities that followed, including swimming in the lake, were not. In *Ski World*, a ski resort employee was injured while tubing at an after-hours party at the resort. Interestingly, attendance at that party was not mandatory, but the court stated that it was "encouraged and therefore presumably expected[.]" *Ski World, Inc. v. Fife*, 489 N.E.2d at 77. The blurring of the lines was most obvious in *Weldy v. Kline*, 616 N.E.2d at 405, where the court stated, "Attendance was voluntary, but encouraged[.]"

After reviewing the aforementioned precedent, I am unable to read the instant facts in such a way as to draw a meaningful distinction that would explain why the injuries in those cases arose out of the employment, but Cary's did not. True, attendance at the clean-up was voluntary in the sense that the failure to attend would not have subjected Cary to the threat of sanctions or reprisals. The same can be said of the after-hours, employer activities in *Ski World* and *Weldy*, however. In those cases, we interpreted the employer's activities as encouraging attendance. Such "encouragement" was deemed sufficient to satisfy the "arise out of" requirement.

In the instant case, Gemtron posted notices on its bulletin boards announcing the clean-up activity and inviting its employees to participate. Moreover, it supplied the employees with work gloves and other equipment, and provided food and bever-

ages to those who attended as well. I cannot say whether these inducements, considered in a vacuum, would constitute "encouragement". This question does not arise in a vacuum, however, but rather in the context of the holdings in *Noble, Ski World,* and *Weldy.* It is clear to me that applying the same principles here as were applied in those cases, especially with respect to the latter two cases, leads to the same conclusion we reached in those cases, i.e., that the after-hours activity arose out of the employment.

In the second part of its analysis, the majority concludes that Gemtron's motive in promoting the clean-up activity was merely altruistic in nature ("a desire to clean up the environment in the areas where it operated", *slip op.* at 578) and not "a matter of business", *Weldy v. Kline,* 616 N.E.2d at 404, such as would confer coverage under the Worker's Compensation Act. I believe that evidence of the requisite business motive in the instant case is just as compelling as was the evidence that led the courts to conclude such motivation was present in *Ski World* and *Weldy.* In *Weldy,* the court found a business motivation based partially upon the facts that attendance was voluntary but encouraged, that the employer supplied food, and the purpose of the party was to generate good will among the employees and to otherwise benefit the employer. The court concluded that these circumstances demonstrated a clear nexus between the work activities and the recreational activities that caused the employee's death. In *Ski World,* the court concluded that a business motivation existed where the employer encouraged its employees to attend the party and provided refreshments.

In the instant case, there was evidence that the clean-up was part of Gemtron's Customer Oriented Master Plan, which outlined the company's goals in a variety of areas. One such goal was to "[p]articipate with applicable local environmental groups or activities." *Transcript* at 9. Although Gemtron's motivation in conceiving and implementing such a plan may well have been partially altruistic, surely it cannot be argued that it was not also in its best business interests to be involved in such local community projects. In my view, Gemtron's concerted effort to publicize its clean-up project in the local media underscores the fact that one of the main purposes of the activity was to enhance its image and reputation in the community of which it was a citizen. Fostering good will with the public was certainly in Gemtron's best business interests.

In summary, Gemtron encouraged its employees to attend the clean-up activities, provided gloves for them, and also provided food and beverages to those who showed up to work. Gemtron's sponsorship of and participation in the event served its best business interests by enhancing its image and thereby fostering a good relationship with the local community. These facts are sufficient to establish that there was a direct nexus between Cary's employer, Gemtron, and the event at which Cary was injured so as to render Cary's activities there within the scope and course of his employment. Thus, Cary's exclusive remedy lay in the Worker's Compensation Act, and the trial court did not have subject matter jurisdiction over Cary's complaint. I would reverse and remand with instructions to grant Knoy's motion and dismiss Cary's action.